IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE COMPLAINT OF MORAN :
TOWING CORPORATION :
 :
 : No. 01-CV-6410
 :

Green, S.J.                                                                                                  March     , 2006

### MEMORANDUM

In December of 2001, Moran Towing of Pennsylvania, a division of Moran Towing Corporation, as owner of the tow JOHN TURECAMO, filed this cause of action seeking exoneration and limitation of liability pursuant to 46 U.S.C. §§ 181, et seq.. The parties agree that this action is within the court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333 and meets the requirements of the Limitation of Liability Act and Federal Rule of Civil Procedure 9(h).

On June 15, 2001, four tugs were assigned by Moran to assist the Greek flag tanker, the M/V ASTRO LIBRA, in docking at Sun Oil's Fort Mifflin Terminal. The ASTRO LIBRA is a very large crude oil container (hereinafter "VVLCC") owned by Jomar Shipping & Trading, Inc. (hereinafter "Jomar") and at the time of the described occurrence was operated by Kristen Navigation, Inc. (hereinafter "Kristen"). Jomar and Kristen are "Claimants" under the provisions of the Limitations of Liability Act and seek monetary recovery from Moran, in personam, and the tug JOHN TURECAMO, in rem, for damages resulting to the ASTRO LIBRA caused by a collision. Moran has filed a counterclaim against Claimants for damage to the JOHN TURECAMO. After full opportunity for discovery and decision of pre-trial motions, this matter proceeded to trial on Claimants' claim and Moran's counterclaim, limited to liability issues. Trial was to the court sitting without a jury and this memorandum adjudicates the liability issues and

constitutes the court's findings of fact and conclusions of law.[1]

The court has been presented with evidence from eyewitnesses, opinions of experts, documents and computer simulations concerning the collision.  The crucial factual determinations involve the movements of the tug and the VVLCC in the minutes immediately before the tug came into contact with the propellers of the ASTRO LIBRA.  The findings of fact concerning the location of the tug in relation to the stern of the VVLCC immediately before the tug became involved with the propellers of the VVLCC are determinative of the outcome.

It is undisputed that on June 15, 2001, the ASTRO LIBRA was proceeding from Big Stone Anchorage in the Delaware Bay to the dock at Sun Oil's Fort Mifflin Terminal.  In accordance with Pennsylvania law, two Delaware River pilots were in control of the vessel as it proceeded on the Delaware River.  In order to dock at the Fort Mifflin Terminal, a docking pilot was retained to direct the docking operation.  Captain Thomas Sullivan accepted the assignment as the docking pilot.  Captain Sullivan is a member of the Docking Pilots Association; he describes himself as an independent contractor.  He was one of several docking pilots who received notice of assignment on a rotating basis from the office of Moran.  There is no evidence that Moran controlled Captain Sullivan's activities as a docking pilot.  The evidence clearly establishes that Captain Sullivan, as docking pilot, was ultimately subject to the direction and control of the master of the ASTRO LIBRA.

Prior to Captain Sullivan assuming the conn of the ASTRO LIBRA, two river pilots namely Captain Hukill and Captain Buckaloo, were in control of the cruiser on its Delaware

---

[1] The following facts as numbered by Claimants' proposed findings are accepted as supported by the evidence: 1-7, 9-14, 17 and 25.
   The following facts as numbered by Moran in its supplemental proposed findings are accepted as supported by the evidence: 1-10, 12, 14-15, 17-26, 27-30, 34, 35-36, 36.2, 37, 37.1, 39, 40.1, 40.3, 40.5, 45-47, 49, 49.1, 50, 51, 52, 55-58, 60, 62, 65, 68, 71, 73 and 76.
   All other requests of the parties are denied as stated for the following reasons: more than one fact is included in the request, the request combines fact and argument, the requested finding is merely that certain evidence appears in the record, or the facts requested are stated out of context.

River voyage.  There is credible evidence that the river pilots notified the Moran office that they intended to arrive at their destination approximately thirty (30) minutes ahead of schedule. Captain Sullivan learned of the intended early arrival of the VVLCC and he received the notice in time to take control of the vessel when it arrived in the vicinity of the Billingsport range. Pursuant to the direction of Captain Sullivan, four tugs including the JOHN TURECAMO were provided by Moran to assist in the docking of the ASTRO LIBRA.  Captain Rizzo, the pilot of the JOHN TURECAMO, was ordered by Captain Sullivan to the starboard quarter of the ASTRO LIBRA to assist in the docking and the other three tugs assigned by Moran were ordered by Captain Sullivan to the port side.

      The river pilots had operated the ASTRO LIBRA at an excessive speed and upon taking over the conn, Captain Sullivan gave orders designed to slow the tanker.  In taking over the conn, Captain Sullivan's testimony is that he was concerned that the speed of the ship was faster than normal coming up the river.  When Captain Sullivan ordered Captain Rizzo to have the JOHN TURECAMO assist on the starboard quarter, the ASTRO LIBRA had not been slowed to a speed satisfactory to Captain Sullivan.  Captain Rizzo piloted the JOHN TURECAMO to a contact point with the ASTRO LIBRA.  In an effort to slow the ASTRO LIBRA, Captain Sullivan ordered the tanker's engines half astern and then full astern in an attempt to slow the vessel for a controlled stop and turn.  Unexpectedly, the bow of the tanker turned from a starboard direction to port.  The excess speed, the unexpected sheer of the tanker and the increased stern suction or turbulence of the water, caused Captain Rizzo's tug to begin to list to starboard and to take on water. Captain Rizzo first attempted to maintain his position in relation to the cruiser and then to extricate his tug from the place of peril.  However, he was not successful and the tug was drawn into contact with the propellers of the tanker causing significant damage to the tanker and to the tug.  Fortunately, no personal injuries were suffered

by the crew of the tug or the personnel of the tanker.

There is conflicting evidence concerning the exact position of the tug in relation to the cruiser as Captain Rizzo attempted to comply with Captain Sullivan's order.  The preponderance of credible evidence supports the testimony of Captain Rizzo, not only as it relates to the tug's response to the premature order of Captain Sullivan to ring up, but also as it relates to the conduct of Captain Rizzo in maneuvering the tug during the emergency created by the operation of the tanker.  Moreover, Captain Sullivan was questioned by Moran's counsel as to the location of the JOHN TURECAMO and responded as follows:

> BY MR. CALDER:
> Q. Were you aware that the tug was aft of the bridge wing on the starboard side?
> A. No. He was – when I last saw him, he was between midships and is forward of the bridge wing.
> Q. Did Captain Rizzo ever tell you on the radio that he was aft of the bridge wing?
> A. No.

Trial Transcript, 4/25/05, P. 120, lines 5-12.

I accept Captain Rizzo's version of the events as straightforward and accurate.  The witnesses called by counsel for the ASTRO LIBRA placed the tug nearer to the sheer of the stern of the cruiser and in closer proximity to the propellers.  However, I am more impressed with the testimony of Captain Rizzo as substantiated by Captain Sullivan than with the testimony of the other witnesses.  It is significant that the witnesses who placed the tug closer to the sheer of the stern never reacted with any cry of concern for the tug's place of peril.  This failure of the witnesses to react at the time of allegedly observing the JOHN TURECAMO in a place of danger suggests that at the time, they believed the tug was being operated in a safe manner.  I note that counsel for the ASTRO LIBRA argues that the testimony of Captain Rizzo is undermined by the fact that, at some time after the accident and after Captain Rizzo was deposed, his employment was terminated by Moran.  I have considered this evidence, limited to

impeachment and the litigation position of Moran. However, the fact that Captain Rizzo was not an employee of Moran at the time of trial enhances rather than undermines his credibility. Captain Rizzo testified that the bow of his tug engaged the cruiser forward of the sheer of the stern of the cruiser and forward of the point designed and intended for a tug giving docking assistance to touch up. Questioning and testimony of Captain Rizzo at trial is as follows:

> BY MR. CALDER
> Q. What did you do after coming alongside the vessel?
> A. I made contact amidship and I drifted back to the quarter to where I was positioned to work right where the flat and flair started.
> Q. That was your intention to put your tug in position at that point where the flat hull started to flair?
> A. Yes.
> Q. Do you know whether or not your tug ever moved off that position?
> A. It didn't move off that position. Not until I stopped engines.

Trial Transcript, 4/26/05, P. 96, lines 9-19.

The evidence supports a finding that, after the JOHN TURECAMO started to take on water and to list and spin in a starboard direction, Captain Rizzo attempted to bring the tug under control and to maintain his position, but was unable to do so. The combination of circumstances produced by the erratic movement of the cruiser caused the tug to be swept into contact with the propellers. Certain witnesses would place Captain Rizzo's tug closer to the stern of the ASTRO LIBRA; however, given the short period of time involved in the occurrence and the fact that they did not have the vantage point of observation that Captain Rizzo had, I have credited Captain Rizzo's testimony.

Counsel for the ASTRO LIBRA contends that the presumption of fault and causation runs against the assisting tug. Relying on The Olympic, 224 F. 436 (2d Cir. 1915), he cites the following language as supporting his position:

> The Olympic, under the law, undertook not to expose the tug to any extraordinary risk while engaged in the service. The tug held herself out as experienced and competent to facilitate the operations of the steamship, without embarrassing her unnecessarily, and as competent to exercise due care for her own

5

>  safety.  We do not see in what respect the Olympic was in fault.  She was conducting the usual process of berthing in the usual way.  Presumably with a large steamer it always involves some risk, which is assumed by the tugs which engage in it.  Every one who is familiar with the process knows that the steamer uses her own power, and, in doing so, must use her propellers one way or the other, sometimes acting very promptly; it would hardly seem practicable for her to give notice to the attendant flotilla every time she started or stopped them, and there is no testimony indicating any such practice.  The Olympic did not order or invite the tug to put herself in position to push at any particular place.  The tug master selected what he thought would suit, and hailed some one at that part of the steamer to throw him a line.  We agree with Judge Hazel that, in the absence of any specific instructions from the steamer to bring the tug to any particular place on her quarter, the [tug] should have kept herself under control or taken a position farther from the stern.

The Olympic, 224 F. at 437.  The Olympic and the other cases cited are factually distinguishable from the instant matter.[2]  Here, there is an abundance of evidence of fault by the river captains in operating the cruiser at an excessive speed, the docking pilot in not bringing the vessel to an appropriate speed before ordering the JOHN TURECAMO to assist, and fault in the swerve of the cruiser in the direction of port instead of starboard which remains unexplained.  The Olympic applies only where the assisting tug comes into contact with the propellers of the assisted cruiser and the cruiser is without fault.  That is not the situation here.  In regard to Claimants' recovery from Moran and the JOHN TURECAMO, The Olympic is not precedent for imposing liability on the tug, nor does The Olympic bar recovery for damage to the tug where the cruiser is at fault.

The ASTRO LIBRA Claimants also assert that the negligence of the river pilot and docking pilots should be a basis for imposing liability on Moran and the JOHN TURECAMO.  I must reject this argument as there is no evidence of record to support a finding that the pilots were employees of Moran.  However, there is evidence of record that at the time of the mishap

---

[2]The Olympic, 224 F. 436 (2d Cir. 1915), see also, Grace Line, Inc. v. Tug C. Hayward Meseck and Meseck Towing Lines, 150 F.Supp. 425 (S.D.N.Y. 1957), aff'd., 248 F.2d 736 (2d Cir. 1957); The City of New York, 54 F. 181 (2d Cir. 1893); Tuscania-W.H. McAllister (E.D.N.Y.), 1940 A.M.C. 32; Charles Kurz & Co., Inc. v. United States (S.D.N.Y.), 1946 A.M.C. 1303; Dorothy Luckenbach-Hustler (E.D. Pa.), 1938 A.M.C. 704; Edward T. Dalzell (S.D.N.Y.), 1938 A.M.C. 273; Freehold-Saxonia (S.D.N.Y.), 1928 A.M.C. 1601.

they were acting pursuant to and subject to the control of the master of the ASTRO LIBRA. Thus, the negligence of the river pilot and docking pilots is attributable to the Claimants and is the basis for imposing liability in favor of Moran and against the Claimants. This result is reinforced by the contractual arrangements entered into by Moran and the Claimants. The terms and conditions of their contract includes the pilotage clause in Section 9 of the Schedule of Rates, Terms and Conditions which states as follows:

> PILOTAGE: We do not furnish pilots or pilotage to vessels making use of or having available their own propelling power, so that whenever any licensed pilot or a captain of any tug which is furnished to or is engaged in the services of assisting a vessel making use of or having available her own propelling power, participates in directing the navigation of such vessel, or in directing the assisting tugs, from on board such vessels or from elsewhere, it is agreed that he becomes the borrowed servant of the vessel assisted and her owner or operator for all purposes and in every respect, his services while so engaged being the work of the vessel assisted, her owner and operator, and being subject to the exclusive supervision and control of the vessel's personnel. Any such service performed by any such person is beyond the scope of employment for us and neither those furnishing the tugs or lending such person, nor the tugs, their owners, agents charterers, operators or managers shall be liable for any act or omission of any such person. The provisions of this paragraph may not be changed or modified in any such manner whatsoever except by written instrument signed by an officer of the company.

Thus, it is clear that the parties intended by their contract to relieve Moran from liability for the negligence of a non-Moran pilot. The validity of such a contract was upheld in <u>Sun Oil Co. v. Dalzell Towing Co.</u>, 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311 (1932) even where the negligent pilot was in fact an employee of the owner of the tug. Here, the negligent pilots were not employees of Moran; therefore, their negligence forms no basis at law to impose liability upon Moran. While Claimants cite to <u>U.S. v. Nielson</u>, 349 U.S. 129, 75 S.Ct. 654, 99 L.Ed. 939 (1955), said case has no relevance to the instant cause of action because Moran does not seek to recover from Claimants because of the negligence of Moran's employees. Rather, Moran seeks to recover for the negligence of pilots in the employment of Claimants and for whose negligence Claimants are required to respond in damages.

Moran argues that the ASTRO LIBRA was in violation of the Inland Navigational Rules, 33 U.S.C. §§ 2001 et seq., particularly Rule 6 which requires vessels to proceed at a safe speed and Rule 5 which requires a vessel to formally post a lookout to protect a tug in a docking operation. Claimants argue that the rules are not applicable to the instant situation because it involves a vessel and an assisting tug. I conclude that the excessive speed of the vessel was a substantial factor in bringing about the collision and the causal connection is clear without reliance upon a presumption resulting from the violation of the rule to establish causal connection. As to the failure to post a lookout, it is undisputed that the ASTRO LIBRA did not formally post a lookout. However, the failure to post did not contribute to the mishap as the evidence clearly establishes that the tug touched up in a proper manner and at a proper place on the vessel and a lookout would not have been called upon to issue a warning of danger.

On the issue of liability, Claimants also assert that Moran is liable because of the unseaworthiness of the JOHN TURECAMO. However, the evidence does not support a finding that the JOHN TURECAMO was unseaworthy at the time of this incident. The major assertion by Claimants is that the clutch mechanism on the tug had more than a seven second delay in functioning and that this delay allegedly prevented Captain Rizzo from timely removing the tug from its place of peril. The assertion that the JOHN TURECAMO would have been able to escape its place of peril if the clutch had reacted more rapidly is not supported by credible evidence in the record. There is no convincing evidence that the tug would have avoided the vessel's propeller had the clutch delay factor been further reduced. Accordingly, liability for unseaworthiness under this theory and other grounds asserted is not supported by the record.

The final attack by Claimants is that Captain Rizzo was not sufficiently educated, trained and experienced to undertake and assist in the docking of a VVLCC the size of the ASTRO LIBRA. The record reveals that Captain Rizzo is a graduate of Maine Marine Academy, has

worked in the tugboat industry for many years and shortly before this incident, functioning as Captain of the JOHN TURECAMO, assisted Captain Sullivan in docking a vessel of comparable size. Thus, the evidence of record does not support a finding of inadequacy on the part of Captain Rizzo.

In summary, I find from the evidence of record that the instant mishap was caused solely by the negligence of the pilots aboard the ASTRO LIBRA. Further, I find that said pilots were at all times subject to the direction and control of the Master in control of said vessel and there is no evidence of record to support a finding that the pilots aboard the ASTRO LIBRA were employees of Moran. Additionally, the evidence of record is not sufficient to support a finding of negligence on the part of Captain Rizzo or any employee of Moran. The evidence does not support a finding of unseaworthiness of the JOHN TURECAMO. Accordingly, I will enter an order exonerating Moran Towing Corporation and the JOHN TURECAMO from all claims of Jomar Shipping and Trading Inc. and Kristen Navigation Inc.. Because of the order of exoneration, I do not reach the questions concerning limitation of liability. The evidence supports a finding of liability on Claimants for any damage caused to the tug JOHN TURECAMO. An appropriate Order follows.